**MICHAEL B. PADDEN, ESQUIRE**
PADDEN LAW FIRM, PLLC
Eagle Point Business Park
8673 Eagle Point Boulevard
Lake Elmo, MN 55042
651.789.6545 | mike.padden@paddenlaw.com
(Co-lead Plaintiff's Counsel)

**DEVON M. JACOB, ESQUIRE**
JACOB LITIGATION, INC.
P.O. Box 837
Mechanicsburg, PA 17055-0837
717.796.7733 | djacob@jacoblitigation.com
(Co-lead Plaintiff's Counsel)
(Pro Hac Vice Admitted)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **JENNIFER L.M. LEMAY,** *personally,* *and as the guardian of* **CLE, VE,** *minors, and* **COURTNEY J. LIVINGSTON,** <br> **Plaintiffs,** <br><br> **v.** <br><br> **MICHAEL B. MAYS,** **CITY OF MINNEAPOLIS, MINNESOTA, and** **COMCAST CABLE COMMUNICATIONS, LLC** **d/b/a XFINITY HOME SECURITY,** **Defendants.** | **No. 0:19-cv-02463** <br><br> **Chief Judge: John R. Tunheim** **Magistrate Judge: Kate M. Menendez** <br><br> **CIVIL ACTION – LAW** **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

**AND NOW** come the Plaintiffs, JENNIFER L.M. LEMAY, personally, and as the guardian of VE, a minor, and CLE a minor; and COURTNEY J. LIVINGSTON, by and through their undersigned counsel, MICHAEL B. PADDEN, ESQUIRE, and the law firm of PADDEN LAW FIRM, PLLC, and DEVON M. JACOB, ESQUIRE, and the law firm of JACOB LITIGATION, INC., and aver the following:

### Jurisdiction and Venue

1. This action is brought pursuant to 42 U.S.C. § 1983.

2. Jurisdiction is founded upon 28 U.S.C. §§ 1331 (federal question), 1343 (civil

1

rights and elective franchise) & 1367 (supplemental jurisdiction).

3.      Venue is proper in this Court, as the cause of action arose in the District of Minnesota.

## Parties

4.      Plaintiff, Jennifer L.M. LeMay, is an adult individual, who during all relevant times, lived in Minneapolis, Minnesota. Ms. LeMay is the parent and guardian of VE, a minor, and CLE, a minor.

5.      Plaintiff, VE, is a minor female individual, who during all relevant times, was 13 years old and lived in Minneapolis, Minnesota.

6.      Plaintiff, CLE, is a minor male individual, who during all relevant times, was 15 years old and lived in Minneapolis, Minnesota.

7.      Plaintiff, Courtney J. Livingston, is an adult individual, who during all relevant times, lived in Minneapolis, Minnesota.

8.      Defendant, Michael B. Mays, is an adult individual, who during all relevant times, was employed by the Minneapolis Police Department, as a police officer. All of Mays' actions or inactions were taken under color of state law. Mays is sued in his individual capacity.

9.      Defendant, City of Minneapolis ("City"), is located in Hennepin County, Minnesota. The City of Minneapolis owns and operates the Minneapolis Police Department ("MPD"). The City has a business address of City Hall, 350 South Fifth Street, Room 307, Minneapolis, MN 55415. MPD has a business address of City Hall, 350 South Fifth Street, Room 130, Minneapolis, MN 55415-1389.

10.     Defendant, Cable Communications, LLC d/b/a Xfinity Home Security ("Xfinity"), is a subsidiary of the Comcast Corporation, which has a business address of One Comcast Center, Philadelphia, PA 19103-2838.

**<u>Facts</u>**

11.     On July 8, 2017, at approximately 8:51 PM, Courtney Livingston and VE were at Plaintiffs' home, located at 3819 Queen Avenue N., Minneapolis, MN 55412, with their two dogs, Ciroc and Rocko.

**A.  <u>Rocko and Livingston</u>**

12.     Rocko is a neutered male American Staffordshire Terrier, who is grey and white in color.

13.     Plaintiffs, either individually or jointly, have been the sole or joint owner of Rocko, since he was eight (8) weeks old.

14.     On the date in question, Rocko was approximately five (5) years old, 130 pounds, and had a lifetime registration with the City.

15.     Rocko was microchipped, and was up to date with all of his vaccinations.

16.     Rocko had/has never exhibited aggression toward anyone.

17.     At approximately age nine (9), Livingston was diagnosed with a severe anxiety disorder.

18.     At the onset of anxiety/panic attacks, Livingston often suffers from pseudoseizures.

19.     When a human is about to suffer a seizure, they release pheromones that dogs can detect.

20.     Around 2014, Rocko began to alert on these pheromones and warn Livingston and

3

others that the seizure was about to occur.

21.     When the seizure would begin, he would position himself under portions of Livingston's body, i.e., her head, to try to prevent her from suffering injury.

22.      On the date of the incident, Rocko was Livingston's emotional service animal and seizure alert animal.

**B.  Ciroc and CLE**

23.     Ciroc is a neutered male American Staffordshire Terrier, who is brown and white in color.

24.     Plaintiffs, either individually or jointly, have been the sole or joint owner of Ciroc, since he was nine (9) weeks old.

25.     On the date in question, Ciroc was approximately five (5) years old, 60 pounds, and had a lifetime registration with the City.

26.     Ciroc was microchipped, and was up to date with all of his vaccinations.

27.     Rocko had/has never exhibited aggression toward anyone.

28.     When CLE was approximately five (5) years old, he was diagnosed with multiple emotional behavioral disorders.

29.     As a result, CLE is considered disabled, and receives PCA services and social security disability.

30.     By the time Ciroc was 6 months old, he naturally alerted for CLE's panic attacks, and provided him with reassurance and distraction.

31.     Using publicly available research and training materials, CLE trained Ciroc to be a service animal, i.e., weapons alert, self-harm alert, and medication alerts.

32.     On the date of the incident, Ciroc was CLE's service animal for psychiatric and sensory disabilities and impairments, and his training exceeded the Americans with Disabilities Act ("ADA") Service Animal requirements.

**C.  False Alarm**

33.     On the referenced date and approximate time, Livingston accidentally set off the burglar alarm system in Plaintiffs' home.

34.     At approximately 8:42 PM, Xfinity notified MPD of a residential burglar alarm activation at Plaintiffs' home.

35.     At approximately 8:54 PM, LeMay notified Xfinity of the accidental burglar alarm activation.

36.     Pursuant to FED.R.CIV.P. 9(d)(2), Plaintiffs allege the following statements in the alternative:

a.      **Alternative 1:** Xfinity notified MPD that the burglar alarm had been cancelled and that there no longer was a need for police services at Plaintiffs' home.

b.      Regardless, at approximately 9:16 PM, MPD officers responded to the burglar alarm.

c.      **Alternative 2:** Xfinity failed to notify MPD that the burglar alarm had been cancelled and that there no longer was a need for police services at Plaintiffs' home.

d.      As a result, at approximately 9:16 PM, MPD officers responded to the burglar alarm.

**D.  Minneapolis Police Department Responds to Cancelled Alarm**

37.     Pursuant to FED.R.CIV.P. 9(d)(2), Plaintiffs allege the following statements in the

5

alternative:

a.    **Alternative 1:** Not knowing that police services were no longer needed, MPD Police Officers Michael Mays ("Mays") and Daniel Ledman ("Ledman") self-assigned themselves to the call.

b.    **Alternative 2:** Despite knowing that police services were no longer needed or requested, Mays and Ledman self-assigned themselves to the call.

38.    At approximately 9:18 PM, Mays and Ledman arrived at Plaintiffs' home.

39.    The backyard to Plaintiffs' home was surrounded by an approximate 6 foot wood privacy fence with two gates – one locked and one unlocked.

40.    At approximately 9:19 PM, before either officer attempted to make contact with a resident at the front door, Mays jumped the privacy fence into Plaintiffs' backyard.

41.    When Mays jumped the privacy fence, he did not have consent, a warrant, or probable cause _and_ exigent circumstances required to lawfully do so.

42.    A home security video recording reveals that Mays and/or Ledman can be seen walking past the front door to the home five (5) times before attempting for the first time to make contact with anyone inside.

43.    At approximately 9:21 PM, Ledman knocked on Plaintiffs' front door, which was answered by Livingston with Rocko by her side.

44.    Livingston advised Ledman that she had accidentally set off the burglar alarm, and that her mother, LeMay, had already contacted Xfinity to cancel the alarm.

45.    As a result of improper training, despite knowing that Mays had entered the backyard, Ledman never (a) inquired about additional animals/canines on the property, (b) told

Livingston to secure Rocko, (c) told Livingston that Mays had entered the backyard, or (d) told Livingston to stay out of the backyard for her own safety.

### E.  **Mays Shoots Ciroc and Rocko**

46.    Ciroc was a trained service animal for psychiatric and sensory disabilities and impairments.

47.    Rocko was a trained emotional service animal and seizure alert animal.

48.    As such, neither service animal would have attacked or harmed Mays.

49.    Regardless, as discussed below, while Ledman and Livingston were speaking, Mays fired four bullets at the service animals from his duty weapon; a Glock 17 semiautomatic 9mm handgun.

50.    After Mays jumped Plaintiffs' privacy fence, Ciroc walked toward Mays wagging his tail in a friendly manner to greet Mays.

51.    Unfortunately, having not been trained on canine behavior or on how to safely interact with canines and/or service animals, Mays became unreasonably fearful of the service animal who greeted him.

52.    Mays' *subjective* fear, however, was not *objectively* reasonable, as the service animal had not exhibited aggressive behavior toward Mays.

53.    Inexplicably, for no lawful reason, Mays shot Ciroc in the face, causing Ciroc fear and great pain.

54.    After being shot in the face, Ciroc yelped in pain, fell to the ground, and then ran into his home.

55.    Upon hearing the loud noise, Rocko went to investigate.

56.     Rocko presented himself to Mays in a non-threatening manner.

57.     Mays again became unreasonably fearful of the service animal who greeted him.

58.     Mays' *subjective* fear, however, was again not *objectively* reasonable, as the service animal had not exhibited aggressive behavior toward Mays.

59.     Shockingly, for no lawful reason, Mays shot Rocko multiple times in his body.

60.     VE witnessed the shootings and/or their immediate aftermath through an upstairs bedroom window, causing her to suffer great emotional distress.

61.     Fortunately, both Ciroc and Rocko survived being shot.

62.     At approximately 9:22 PM, after shooting Ciroc and Rocko, Mays climbed back over the privacy fence, and exited Plaintiffs' backyard.

63.     Mays advised Ledman that after he shot Ciroc and Rocko, a female (believed to be Livingston) exited the rear of the home, into the backyard, screaming.

64.     Ledman directed Livingston to secure Ciroc and Rocko inside the home.

65.     Livingston and VE secured Ciroc and Rocko in VE's upstairs bedroom.

66.     VE stayed alone in her bedroom with Ciroc and Rocko and tried to comfort them, while herself being terrified that they might die.

67.     Ciroc and Rocko, who were gravely injured, bled all over the backyard, kitchen, dining room, living room, interior stairs and landing, and the carpet in VE's bedroom.

68.     Observing Ciroc and Rocko in their injured state caused both Livingston and VE to suffer great emotional distress.

69.     At approximately 9:42 PM, CLE arrived and learned that both Ciroc and Rocko had been shot and became emotionally distraught.

F. **Ciroc and Rocko Seriously Injured**

70.     Ciroc and Rocko were transported by private vehicle to Affiliated Emergency Vet Services (now "BluePearl Vet Hospital"), located at 4708 Olson Memorial Highway (Hwy 55), Golden Valley, MN 55422.

71.     The City, through its officers, advised the vet hospital that LeMay was to be held solely financially responsible for any veterinary services provided.

72.     Before agreeing to provide necessary emergency care to Ciroc and Rocko, the vet hospital provided an estimate for expected services to be provided, and required a 50% deposit in the amount of $5,800.

73.     Since LeMay did not have the necessary funds, a generous friend lent LeMay the necessary funds.

74.     Due to the severity of their injuries, both Ciroc and Rocko were subsequently treated at the University of Minnesota Veterinary Medical Center, 1365 Gortner Avenue, St. Paul, MN 55108.

75.     The bullet entered Ciroc below and lateral to the left eye and passed through the caudal left mandible and lodged in the area of the left prescapular lymph node.

76.     As a result of being shot by Mays, Ciroc suffered the following injuries: mandibular fracture, multiple fractured teeth (right and left molars and premolars), and extensive soft tissue damage.

77.     More specifically, a cat scan revealed that Ciroc suffered the following internal injuries:

A markedly comminuted fracture is present of the caudal body and ramus of the left mandible. The rostral aspect of this fracture is at the level of the 2nd left

mandibular molar (which also has a fractured crown). The remainder this fracture involves the majority of the left ramus including the ventral third of the coronoid process and the rostral aspect of the condylar process. The condylar portion of this fracture is rostral to the temporomandibular joint but there are some nondisplaced fissures into the Temporomandibular joint. A nondisplaced, complete, comminuted fracture is also present of the rostral aspect of the left zygomatic bone (hollowed out due to passage of bullet). Associated with these fractures and extending caudally along the left ventral neck are multiple metallic ballistic fragments with associated soft tissue gas and swelling. A collection of these metallic fragments is also present within the left mandibular salivary gland which is enlarged and ruptured. Additionally, in the region of the left mandibular salivary gland and extending caudally within the fascial planes are several collections of fluid attenuation which are mildly rim-enhancing. The left mandibular and medial retropharyngeal lymph nodes are mildly enlarged and hyperenhancing relative to the contralateral nodes. A few foci of mineral are associated with both horizontal ear canals (may indicate past ear infections).

78.     As a result of Ciroc's caudale mandible being shattered, the extent of his facial injuries, and the associated pain and unwillingness to eat, a stomach feeding tube was required for nutrition and the administration of medication.

79.     As a result of being shot by Mays, Rocko suffered the following injuries: right shoulder, as well as the left forelimb and thorax.

80.     As a result of these injuries, Rocko had three drains surgically implanted, and suffered a complication involving the formation of an abscess over his right forelimb.

81.     Both Ciroc and Rocko's injuries were painful, required extensive invasive specialized medical treatment, and to date, continue to require invasive specialized medical treatment.

82.     Both Ciroc and Rocko suffered permanent disabling injuries.

83.     Due to fear, Rocko must now be heavily medicated before visiting the vet.

84.     As a result of their injuries, neither Ciroc nor Rocko are willing to perform their service animal tasks.

10

85.     Ciroc and Rocko are now family pets.

**G.  National Standards for Police Encounters with Canines and Available Free Training**

86.     There exist recognized and professionally accepted best practices and industry standards for police encounters with canines.

87.     These accepted industry standards have been recognized at a national level since at least 2011.

88.     By way of example, COPS through the U.S. Department of Justice has a full free training program available to all law enforcement personnel (and even to the general public) on its website.

89.     According to the industry standards, long standing documentation and records of injuries from dogs in the United States, dog bites that cause "serious bodily injury" are extremely rare, and fatalities are even rarer.

90.     According to the industry standards, the perception that a single dog presents a life-threatening danger to a healthy adult male who is wearing a thick uniform and bullet-proof vest, is objectively unreasonable, and it has been well-documented to be a false perception.

91.     Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.      As of the date in question, despite knowing that patrol officers regularly encountered dogs, the City had not adopted and implemented a dog handling policy;

b.      As of the date in question, only a fraction of the City's approximate 850 officers had received any dog related training.

11

92.     Had Mays been provided with the aforementioned policies and training that at least met the industry standards, he would have recognized the service animals' behavior as an invitation to play, not as a threat.

93.     Moreover, Mays would have known that a single canine presents as a very low threat of serious bodily injury or death.

94.     Additionally, Mays would have known that oleoresin capsicum (pepper spray) is immediately effective against dogs.

**H.  The City's Cover Up**

95.     MPD and Mays issued a Public Information Report in which they falsely reported to the public that "two large pitbulls charged at officer."

96.     Plaintiffs' home security video, however, rebuts this claim.

97.     Plaintiffs' home security video definitively establishes that when Mays shot Ciroc, Ciroc was slowly walking towards him while wagging his tail.

98.     In his subsequent incident report, Mays changed his description of the service animals' actions to "rushing towards me."

99.     The Police Officers Federation of Minneapolis issued a Press Release that contained several false statements, including but not limited to, the following:

a.     That the officer saw the open door before jumping the fence into the Plaintiffs' yard;

b.     That upon seeing the open door, the officer believed that a burglary or home invasion was in progress and that he jumped the fence to investigate further;

c.     (Directly contradicting MPD and Mays) that the first Pitbull "slowly continued to

12

advance towards the Officer" before being shot.

d.     "If a dog were to bite the Officer it could cause severe, potentially career ending injury, if not life ending."

100.    Neither the City nor the Police Officers Federation of Minneapolis issued retractions of or corrections to their false/misleading statements.

**I.   Deficient City Policy and Training**

101.    The City has not adopted a policy regarding the handling of service animals or family dogs.

102.    The City's Use of Force Policy 5-300 provides the City's policy with respect to the use of force against "another," "subjects," "actors," and "persons," but is silent with respect to the use of force against animals or canines. See 5-302 (Use of Force Definitions).[1]

103.    The City's Search and Seizure Policy 9-200 provides the City's policy with respect to the search of people, vehicles, dwellings, and buildings, but is silent with respect to the search of the curtilage around a dwelling and/or other privately owned land.

104.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.     The City knew that its officers routinely are required to make decisions regarding when they are permitted by law to enter and/or search a citizen's private land/property.

---

[1] While the Use of Force Policy 5-300 clearly is not intended to govern the use of force against canines, the policy references "dog" one time. See 5-318(IV)(D)(3) ("The remote restraint device should not be deployed against an animal as part of a plan to deal with a potentially dangerous animal, such as a dog, etc.").

b.      The City knew that its officers routinely climbed fences and entered the backyards of private properties without a lawful basis on which to do so.

c.      Despite it being plainly obvious to the City that additional or different training would stop the practice of its officers engaging in the aforementioned unlawful conduct, the City did not provide the training.

d.      The City knew that officers routinely encountered service animals and/or domesticated canines on patrol without necessary and appropriate policies and training that meets the standard in the industry.

e.      The standard in the industry is evidenced by US DOJ free training for law enforcement and the public regarding canine behavior and how to safely interact with canines without unnecessarily injuring them.

f.      The regularity of such encounters while operating below the industry standard made the potential for constitutional violations to occur plainly obvious to the City.

g.      The City did not adopt appropriate policies to govern how officers could safely interact with service animals and/or domesticated canines without unnecessarily injuring the animals;

h.      The City knew that its officers were not properly trained regarding how to safely interact with service animals and/or domesticated canines without unnecessarily injuring the animals;

i.      The City knew (or should have known) that the US DOJ publishes free training for law enforcement and the public regarding canine behavior and how to safely interact with canines without unnecessarily injuring them.

14

j.     The City, however, did not provide this free and readily available training to its officers or even make them aware of its existence.

k.     The City knew that its officers routinely misidentified friendly canines as threats; as happened in this matter.

l.     The City knew that it had not provided police officers with a non-lethal plan regarding how to interact with service animals and/or domesticated canines while on patrol without unnecessarily injuring the animals.

m.     The City knew that it had not provided police officers with non-lethal options regarding how to safely interact with service animals and/or domesticated canines while on patrol without unnecessarily injuring the animals.

n.     As a direct result of the City's deficient policy and training, City officers have routinely used excessive force, including deadly force, when encountering non-threatening dogs; as happened in this matter.

o.     In the alternative, as a direct result of the City's deficient policy, when City officers encountered aggressive dogs, they routinely used excessive force, often immediately resorting to the use of deadly force, instead of lesser objectively reasonable force; as happened in this matter.

p.     Based on the pattern of past excessive force incidents involving canines, the City was on notice that absent additional and/or different policies and training, City officers would routinely use excessive and/or deadly force against non-threatening canines or aggressive canines when not objectively reasonable.

q.      Despite it being plainly obvious to the City that additional and/or different policies and training was necessary to protect civil rights, the City did not adopt or implement the additional and/or different policies and training.

r.      Furthermore, the City did not adopt, implement, or enforce, an effective internal affairs or disciplinary procedure/program to promote and require lawful conduct from its police officers, ensure accountability to citizens, and protect the rights of citizens.

s.      The City's policy of having a deficient internal affairs/disciplinary procedure/program, was also a moving force behind Mays' unlawful conduct because he learned that City officers were permitted to use excessive force against canines and that he would not suffer any negative employment or criminal consequence as a result of same.

t.      This is evidenced by the fact that for over two years, the City has purportedly been conducting an internal affairs investigation into this incident.

u.      Despite committing a trespass, using unlawful force, and intentionally submitting a false official report to a law enforcement agency, the City has not criminally charged Mays, disciplined him, and/or terminated his employment.

v.      Despite the fact that MPD officers committed a trespass, used unlawful force, violated the ADA, and intentionally submitted false and/or misleading official reports to a law enforcement agency, the City did not retrain any of its police officers.

105.    Pursuant to FED.R.CIV.P. 9(d)(2), Plaintiffs allege the following statements in the alternative:

a.      **Alternative 1:** The City intentionally delayed its investigation in an attempt to protect itself against further negative opinion because it does not have related polices and/or

16

training; thereby leaving citizens, service animals, and canines, at risk.

b.      **Alternative 2:** The City intentionally delayed its investigation because it does not understand its own policies and/or training, and therefore, cannot determine whether or not Mays' use of force violates City policies and/or training; thereby leaving citizens, service animals, and canines, at risk.

c.      **Alternative 3:** The City intentionally delayed its investigation in the hope of avoiding civil liability or reducing its exposure to same; thereby leaving citizens, service animals, and canines, at risk.

**J.   Livingston, CLE and VE Severely Traumatized**

106.    On the date of the incident, CLE was a Title II qualified individual with a disability. Id. at §35.108(a).

107.    The ADA expressly distinguishes between emotional support animals – animals that only provide comfort or emotional support – which are not covered by the ADA, and service dogs – animals that are specifically trained to perform disability-mitigating tasks – which are covered by the ADA.

108.    Title II defines a "service animal," as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." See id. at §35.104.

109.    The work or tasks performed by a service animal must be directly related to the individual's disability. See id. at §35.104.

110.    Examples of qualifying work or tasks include, "assisting an individual during a seizure," i.e., a Seizure Response Dog, or "helping persons with psychiatric and neurological

disabilities by preventing or interrupting impulsive or destructive behaviors," i.e., a Psychiatric Service Dog. See id. at §35.104.

111.    Regardless of what specific tasks a service dog performs, once it can reliably perform at least one disability-mitigating task, it is considered a service dog, and the provisions of the ADA apply.

112.    The ADA specifically states that covered entities and their employees cannot require "medical documentation," "a special identification card," or "training documentation."

113.    On the date of the incident, both Ciroc and Rocko met the ADA definition of a service animal.

114.    When Mays shot and severely injured both Ciroc and Rocko, he forever deprived CLE and Livingston of the services provided by their service animals.

115.    As a result of witnessing this violent incident, Livingston's cluster seizures increased in duration.

116.    Moreover, Livingston's ADHD and depression intensified.

117.    CLE became emotionally unstable and had to receive seven months of inpatient cognitive behavioral therapy at a county home school.

118.    Despite it not being her fault, VE blames herself for not yelling loud enough from the window to prevent the shooting.

119.    VE engaged in "cutting" behavior, wishing that she could take the pain away from the dogs; stating that said she deserved to hurt just like them.

120.    After the incident, VE was unable to sleep in her bedroom where she had sat with Ciroc and Rocko while they were injured.

18

121.    Even after the carpet was replaced, VE could not even stand in the doorway to her bedroom without suffering a panic attack.

122.    After witnessing the violent incident, VE no longer felt safe inside of her home, and eventually, had to go stay with a family member until the family could move.

123.    VE suffers from nightmares of the incident and needed to engage the services of a professional therapist.

### Count I

**Plaintiffs v. Defendant Mays**
**Unlawful Search of Private Property**
**Fourth and Fourteenth Amendments**
**(Pursuant to 42 U.S.C. § 1983)**

124.    Paragraphs 123 are stated herein by reference.

125.    The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

126.    When Mays jumped the privacy fence and entered the Plaintiffs' backyard, he did not have consent, a warrant, or the probable cause _and_ exigent circumstances required to lawfully do so.

127.    Defendant Mays is not entitled to immunity, as an objectively reasonable police officer would have understood that it was unlawful for him to jump a privacy fence to enter a private person's backyard without consent, a warrant, or probable cause _and_ exigent circumstances.

128.    Defendant Mays' unlawful entry and search of Plaintiff's backyard is the proximate cause of the unlawful injury to Plaintiffs' property, i.e., the shooting injuries inflicted on Ciroc and

Rocko, and the resulting mental anguish that Plaintiffs suffered as a result. See County of Los Angeles v. Mendez, 581 U.S. ——, 137 S.Ct. 1539 (2017).

129.    This is because a 6 foot locked fence is a clear warning and notice that persons other than the owner of the property should not enter without permission, and importantly, that the owner of the property is not expecting unauthorized persons to be within the locked enclosure.

130.    Moreover, commonsense dictates that the very purpose of a 6 foot fence is to keep persons/animals on their respective sides.

131.    Furthermore, it is common knowledge that dogs are frequently found in the backyards of private residences (as opposed to commercial buildings, public garages, libraries, hospitals, etc.).

132.    Finally, it is common knowledge that dogs generally protect their owners and homes.

133.    There was no life/death exigency that required Mays to immediately enter Plaintiffs' locked backyard, and had Mays announced himself (by obtaining consent or during the service of a warrant), Ciroc and Rocko could have been further confined before he entered.

134.    As such, the Defendant is personally liable to the Plaintiffs for causing their injuries, which include but are not limited to emotional distress and related physical injuries, damage to personal property, Ciroc and Rocko's financial replacement value as service animals, and Ciroc and Rocko's medical bills.

**Count II**

**Plaintiffs v. Defendant Mays**
**Unlawful Seizure of Personal Property**
**Fourth and Fourteenth Amendments**
**(Pursuant to 42 U.S.C. § 1983)**

135.    Paragraphs 123 are stated herein by reference.

136.    The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

137.     "Effects," as referenced in the Fourth Amendment, includes, personal property. See United States v. Place, 462 U.S. 696, 701 (1983).

138.    A Fourth Amendment "seizure" of personal property occurs when "there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984).

139.    The destruction of personal property has been determined to be a meaningful interference with an individual's possessory interest in that property. See id. at 124-25.

140.    In Minnesota, by statute, dogs are personal property. See Minn. Stat. § 609.52.

141.    It is undisputed that Ciroc and Rocko's seizure did not occur pursuant to a valid warrant.

142.    Therefore, to determine if Ciroc and Rocko's warrantless seizure was objectively reasonable, "we 'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" United States v. Place, 462 U.S. 696, 703 (1983).

143.    According to the industry standards, long standing documentation and records of

21

injuries from dogs in the United States, dog bites that cause "serious bodily injury" are extremely rare, and fatalities are even rarer.

144.    According to the industry standards, the perception that a single dog presents a life-threatening danger to a healthy adult male who is wearing a thick uniform and bullet-proof vest, is objectively unreasonable, and it has been well-documented to be a false perception.

145.    The violent shooting of Ciroc and Rocko, loyal well-trained service animals, in the vicinity of their family, is a significant intrusion on the Plaintiffs' Fourth Amendment interests.

146.    Defendant Mays did not have *any* legitimate interest, let alone an important government interest, in shooting Ciroc and/or Rocko, while he was trespassing in Plaintiffs' enclosed backyard.

147.    Defendant Mays is not entitled to immunity, as an objectively reasonable police officer would have understood that it was unlawful for him to damage a citizen's personal property in the absence of a substantial public interest that would be served by the damage.

148.    Moreover, an objectively reasonable officer would know that it is unlawful to use deadly force to respond to a threat of a non-serious injury.

149.    As such, the Defendant is personally liable to the Plaintiffs for causing their injuries, which include but are not limited to emotional distress and related physical injuries, damage to personal property, Ciroc and Rocko's financial replacement value as service animals, and Ciroc and Rocko's medical bills.

## COUNT III

**Plaintiffs v. Defendant City**
**Fourth and Fourteenth Amendments– Municipal Liability**
**(Pursuant to 42 U.S.C. § 1983)**

150.    Paragraphs 123 are stated herein by reference.

151.    A municipal entity can be held liable to a Plaintiff if it can be established that a constitutional injury resulted from the implementation of "official municipal policy." Lozman v. City of Riviera Beach, Florida, 585 U.S. ____ (2018).

152.    Pursuant to Monell, municipal liability exists only if "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 400 (1997) (citing Monell v. Department of Social Services of New York, 436 U.S. at 658, 694 (1978)).

153.    Thus, to establish municipal liability, a Plaintiff must establish that the municipality acted or failed to act in any one of three ways:

154.    First, the municipality adopted an official policy that deprives citizens of their constitutional rights.

155.    Second, the municipality tolerated or adopted an unofficial custom that results in the unlawful stripping of constitutional rights.

156.    Third, the municipality failed to train, supervise, or discipline its employees so as to prevent them from unlawfully depriving citizens of their constitutional rights.

157.    Notably, "[a] municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" See Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011).

158.    Pursuant to FED.R.CIV.P. 11(b)(3), it is believed that the following "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery":

a.    The City knew that its officers routinely need to make decisions regarding when they are permitted by law to enter and/or search a citizen's private property.

b.    The City knew that its officers routinely climbed fences and entered the backyards of private properties without a lawful basis on which to do so.

c.    Despite it being plainly obvious to the City that additional or different training would stop the practice of its officers engaging in the aforementioned unlawful conduct, the City did not provide the training.

d.    The City knew that officers routinely encountered service animals and/or domesticated canines on patrol without necessary and appropriate policies and training that meets the standard in the industry.

e.    The standard in the industry is evidenced by US DOJ free training for law enforcement and the public regarding canine behavior and how to safely interact with canines without unnecessarily injuring them.

f.    The regularity of such encounters while operating below the industry standard made the potential for constitutional violations to occur plainly obvious to the City.

g.    The City did not adopt appropriate policies to govern how officers could safely interact with service animals and/or domesticated canines without unnecessarily injuring the animals;

24

h.      The City knew that its officers were not properly trained regarding how to safely interact with service animals and/or domesticated canines without unnecessarily injuring the animals;

i.      The City knew (or should have known) that the US DOJ publishes free training for law enforcement and the public regarding canine behavior and how to safely interact with canines without unnecessarily injuring them.

j.      The City, however, did not provide this free and readily available training to its officers or even make them aware of its existence.

k.      The City knew that its officers routinely misidentified friendly canines as threats; as happened in this matter.

l.      The City knew that it had not provided police officers with a non-lethal plan regarding how to interact with service animals and/or domesticated canines while on patrol without unnecessarily injuring the animals.

m.      The City knew that it had not provided police officers with non-lethal options regarding how to safely interact with service animals and/or domesticated canines while on patrol without unnecessarily injuring the animals.

n.      As a direct result of the City's deficient policy and training, City officers have routinely used excessive force, including deadly force, when encountering non-threatening dogs; as happened in this matter.

o.      In the alternative, as a direct result of the City's deficient policy, when City officers encountered aggressive dogs, they routinely used excessive force, often just deadly force, instead of lesser objectively reasonable force; as happened in this matter.

p.      Based on the pattern of past excessive force incidents involving canines, the City was on notice that absent additional and/or different policies and training, City officers would routinely use excessive and/or deadly force against non-threatening canines or aggressive canines when not objectively reasonable.

q.      Despite it being plainly obvious to the City that additional and/or different policies and training was necessary to protect civil rights, the City did not adopt or implement the additional and/or different policies and training.

r.      Furthermore, the City did not adopt, implement, or enforce, an effective internal affairs or disciplinary procedure/program to promote and require lawful conduct from its police officers, ensure accountability to citizens, and protect the rights of citizens.

s.      The City's policy of having a deficient internal affairs/disciplinary procedure/program, was also a moving force behind Mays' unlawful conduct because he learned that City officers were permitted to use excessive force against canines and that he would not suffer any negative employment or criminal consequence as a result of same.

t.      This is evidenced by the fact that for over two years, the City has purportedly been conducting an internal affairs investigation into this incident.

u.      Despite committing a trespass, using unlawful force, and intentionally submitting a false official report to a law enforcement agency, the City has not criminally charged Mays, disciplined him, and/or terminated his employment.

v.      Despite the fact that MPD officers committed a trespass, used unlawful force, violated the ADA, and intentionally submitted false and/or misleading official reports to a law enforcement agency, the City did not retrain any of its police officers.

26

159.     As such, the Defendant City is liable to the Plaintiffs for causing their injuries, which include but are not limited to emotional distress and related physical injuries, damage to personal property, Ciroc and Rocko's financial replacement value as service animals, and Ciroc and Rocko's medical bills.

### Count IV

**Plaintiffs v. Defendant Xfinity**
**Breach of Contract**
**(Pursuant to Minnesota Law)**

160.     Paragraphs 123 are stated herein by reference.

161.     To establish a breach-of-contract claim, a party must prove three elements: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 833 (Minn. 2011).

162.     LeMay and Xfinity entered into a written contract whereby in exchange for the payment of a fee, Xfinity would monitor LeMay's home burglar alarm system.

163.     In the event that the burglar alarm activates, Xfinity agreed that it would contact MPD to advise that police services were required.

164.     In the event that a burglar alarm is cancelled, Xfinity agreed that it would contact MPD to advise that police services should be cancelled.

165.     It was foreseeable that if Xfinity did not perform its duties, a violent confrontation could result causing property damages, serious injury, and/or death.

166.     LeMay paid the agreed upon fee to Xfinity for the contracted services and materially complied with the contract.

167.    LeMay notified Xfinity that the burglar alarm was false and that police services should be cancelled.

168.    Xfinity failed to notify MPD that the burglar alarm had been cancelled.

169.    MPD officers responded to the false alarm.

170.    A violent confrontation resulted, causing Plaintiffs' injuries discussed herein.

171.    As such, the Defendant is liable to the Plaintiffs for causing their injuries, which include but are not limited to emotional distress and related physical injuries, damage to personal property, Ciroc and Rocko's financial replacement value as service animals, and Ciroc and Rocko's medical bills.

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor as follows:

A.    **Declaratory Judgment:** Providing that the Defendants' conduct violated Plaintiffs' Fourth and Fourteenth Amendment constitutional rights, and rights pursuant to the laws of the State of Minnesota;

B.    **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: emotional distress and related physical injuries, damage to personal property, Ciroc and Rocko's financial replacement value as service animals, and Ciroc and Rocko's medical bills;

C.    **Punitive damages:** Against all Defendants except the public entity;

D.    **Equitable Relief:** An admission of the allegations stated in the Complaint in writing, and a written apology from the Defendants for same;

E.     **Attorney's Fees and Costs**; and

F.     **Discretionary Damages and Relief:** Such other financial or equitable relief that

the Court deems reasonable and just.

**<u>Jury Trial Demand</u>**

Plaintiffs respectfully request a trial by jury on all claims/issues in this matter that may be

tried to a jury.

 

**MICHAEL B. PADDEN, ESQUIRE**                                     **Date: November 6, 2019**
BAR ID: MN177519
*Co-lead Counsel for Plaintiff*

**PADDEN LAW FIRM, PLLC**
Eagle Point Business Park,
8673 Eagle Point Boulevard, Lake Elmo, MN 55042
651.789.6545 | mike.padden@paddenlaw.com

 

**DEVON M. JACOB, ESQUIRE**                                     **Date: November 6, 2019**
BAR ID: PA89182
*Co-lead Counsel for Plaintiff*

**JACOB LITIGATION**
P.O. Box 837, Mechanicsburg, PA 17055-0837
717.796.7733 | djacob@jacoblitigation.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| **JENNIFER L.M. LEMAY,** *personally,*<br>*and as the guardian of* **CLE, VE,** *minors, and*<br>**COURTNEY J. LIVINGSTON,**<br><div align="right">**Plaintiffs,**</div><br>**v.**<br>**MICHAEL B. MAYS,**<br>**CITY OF MINNEAPOLIS, MINNESOTA, and**<br>**COMCAST CABLE COMMUNICATIONS, LLC**<br>**d/b/a XFINITY HOME SECURITY,**<br><div align="right">**Defendants.**</div> | No. 0:19-cv-02463<br><br>**Chief Judge: John R. Tunheim**<br>**Magistrate Judge: Kate M. Menendez**<br><br>**CIVIL ACTION – LAW**<br>**JURY TRIAL DEMANDED** |

**CERTIFICATE OF SERVICE**

I hereby certify that on the date listed below I electronically filed the foregoing with the

Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

_____
**DEVON M. JACOB, ESQUIRE**

**Date:   November 6, 2019**

30